UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Denise Hairston,                          :

                             :           **OPINION AND ORDER**

                 Plaintiff,      :

       -against-           :          20-CV-5600 (KHP)

                             :

Commissioner of Social Security,      :

                             :

                 Defendant.  ::
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/9/2022

**KATHARINE H. PARKER, United States Magistrate Judge**

      Plaintiff, Denise Hairston, currently represented by counsel and legal guardian and maternal grandmother of J.T.S.H., a minor, commenced this action against Defendant, Commissioner of the Social Security Administration (the "Commissioner"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of the Commissioner's decision that J.T.S.H. was not disabled under the Act from January 1, 2009, the onset date of his alleged disability, through the date of the decision, May 8, 2019.  For the reasons set forth below, Defendant's Motion is DENIED, Plaintiff's Motion is GRANTED, and this case is REMANDED to the Commissioner for further proceedings.

## BACKGROUND

      J.T.S.H., born in June 2007, suffers from autism spectrum disorder ("ASD"), attention deficit hyperactivity disorder ("ADHD"), asthma, and knee pain.[1]  He lives with his grandmother and siblings who are in kinship foster care.  (A.R. 37, 44.)  He receives special education services

---

[1] Because the Plaintiff does not challenge the Commissioner's findings pertaining to J.T.S.H.'s asthma or knee pain, the Court does not address them below.

and assistive technology in an integrated teaching classroom.  (A.R. 37.)  At the time of the April

2019 ALJ hearing and subsequent decision, he was attending the sixth grade.  (A.R. 37-38.)

1. **Procedural History**

On March 30, 2017, Plaintiff filed an application for child Supplemental Security Income

("SSI") benefits on behalf of J.T.S.H.  (A.R. 9.)  The application was denied at the initial level on

June 22, 2017.  Plaintiff then requested a hearing, which was held almost two years later on

April 26, 2019 before Administrative Law Judge ("ALJ") Mark Solomon.  (A.R. 9, 30.)  Both

Plaintiff and J.T.S.H. appeared and testified at the hearing.  On May 8, 2019, the ALJ issued a

decision finding that J.T.S.H. had severe mental impairments but was not disabled as defined

under the Act.  (A.R. 9-24.)  The decision became final on April 22, 2020, when the Appeals

Council denied Plaintiff's request for review.  (A.R. 1-5.)

Plaintiff initially proceeding *pro se*, commenced this action on July 9, 2020, contending

that: (1) the ALJ failed to develop the record by obtaining the most recent treatment and

educational records; (2) the ALJ failed to develop the record by failing to sufficiently question

Plaintiff and J.T.S.H. at the hearing; and (3) the ALJ failed to identify which evidence he found

persuasive and cherry-picked his findings from the various reports.  (*See* Complaint and Pl.

Brief; ECF Nos. 1, 37.)  Plaintiff subsequently retained counsel on July 6, 2021.  (ECF No. 28.)

The parties cross-moved for judgment on the pleadings.  (ECF Nos. 36-37, 39-40, 43.)

2. **Summary of the Administrative Record and Hearing**

   *a.  Record*

In February 2016, J.T.S.H. saw Dr. Danielle McBrian at New York Presbyterian Medical Center ("NY Presbyterian") for an electroencephalogram ("EEG") to evaluate his hyperactivity, including symptoms of fast talking, walking, not paying attention, and being "always on the go." (A.R. 175.)  Plaintiff reported that J.T.S.H. was active in class and sometimes forgot his homework, but was otherwise doing well academically.  (A.R. 175.)  The EEG was normal both sleeping and awake, and physical and mental status exams were normal.  (A.R. 175-78.)

In January 2017, J.T.S.H. visited the Upper Manhattan Mental Health Center ("UMMHC") and started receiving psychological care.  (A.R. 226.)  During intake with mental health counselor Sasha Parulis, Plaintiff reported that J.T.S.H.'s medication, Focalin, was not helping him as he remained "hyperactive at home and school with lack of focus in both settings," although he performed well in school.  (A.R. 226.)  J.T.S.H. played with Lego blocks, was energetic and polite, appeared content, engaged, able to remain calm, and respectful. (A.R. 232.)  A mental status exam showed J.T.S.H. was calm and cooperative, clear and audible speech, full affect, euthymic mood, coherent thought process, moderate attention, and intact concentration, memory, judgment, and impulse control.  (A.R. 233-34.)  J.T.S.H. was assessed with ADHD, combined type.  (A.R. 236, 246.)

On January 30, 2017, J.T.S.H. also saw nurse practitioner Analisa Macaluso at NY Presbyterian where Plaintiff reported that J.T.S.H.'s Focalin appeared effective, however according to Plaintiff and J.T.S.H., the dose began to wane before noon and was not effective. (A.R. 166.)  J.T.S.H. denied side effects like insomnia, loss of appetite, or drowsiness, and

Plaintiff reported that J.T.S.H. "continue[d] to do well in 4th grade with no complaints from [his] teacher."  (A.R. 166.)

In March 2017, J.T.S.H. saw psychiatrist Dr. Manuel Mosquera.  (A.R. 222, 238-40.) Plaintiff reported that J.T.S.H. suffered from trouble understanding, forgetfulness, poor attention span, neglected his homework, and had a tough time with other kids.  (A.R. 238.) Plaintiff also reported that J.T.S.H. had been switched to Focalin extended release, "which did not work."  (A.R. 238.)  A mental status exam showed that J.T.S.H. smiled at times without an apparent reason, had trouble with sequences, was irritated by loud sounds, forgot the time, was impulsive, and had limited insight.  (A.R. 239-40.)  Dr. Mosquera noted J.T.S.H.'s disorganization and poor socialization despite fully developed language.  (A.R. 240.)  Dr. Mosquera diagnosed Plaintiff with ADHD and "rule out" ASD and assessed him with a Global Assessment of Functioning ("GAF") score of 50, indicating severe symptoms.  (A.R. 224.)

In November 2017, Plaintiff withdrew J.T.S.H. from treatment at UMMHC because she "found appropriate services for [J.T.S.H.] at Jewish Board family services."  (A.R. 515.)  A termination summary noted that Plaintiff's course of treatment included a "[p]sychiatric assessment, psychosocial assessment, individual therapy, collateral family therapy," that J.T.S.H. "completed a psychological evaluation and autism testing at [YAI Center for Specialty Therapy ("YAI")] and [was] diagnosed with autism," and that "[s]ome family work has been accomplished but most work done with [Plaintiff] to refer her to appropriate services for [J.T.S.H.]."  (A.R. 515.)

Educational records showed that J.T.S.H. had a history of special education due to learning difficulties, attention issues, and language delays, with a full scale IQ of 83 (the low

average range), and verbal IQ of 78 (borderline range), but that he improved with treatment

and special education services.  (A.R. 273.)  In May 2014, J.T.S.H. was evaluated at Harlem

Hospital Center where he was first diagnosed with ADHD with a GAF score of 70.  (A.R. 358-59.)

In the 2014 to 2015 school year, J.T.S.H. was performing at grade level in reading and math but

displayed attention problems, frequent tantrums, and aggressive behavior.  (A.R. 264, 355-56.)

By 2016, J.T.S.H. had made "substantial progress in core expressive and receptive language

skills" and showed average to advanced academic skills overall, although he continued to

struggle with expressive language in the classroom, communicating his basic needs,

distractibility, and needing reminders to stay on task.  (A.R. 399-410.)  It was noted that

J.T.S.H.'s "conflicts with peers can cause him to become emotionally disregulated."  (A.R. 401.)

By May 2017, J.T.S.H.'s individualized education program ("IEP") showed that he was

"functioning at grade-level in the classroom" and that he displayed average speech and

language skills on testing but struggled to remain organized and neat, had to be "reminded to

continue reading because he tend[ed] to space out often" during independent reading, and

struggled with multi-step word problems in math because he did not "follow the proper steps

or process to complete them."  (A.R. 252.)  It noted J.T.S.H. benefited from reminders to remain

on task, could become "distracted and stare away for a while when completing his work," and

was "very un-organized," forgot materials to bring home, and lost his pencils or papers.  (A.R.

253.)  It also noted he attended counseling once per week to "work and strengthen upon his

social skills, developmental[ly] appropriate behavior and responses."  (A.R. 253.)

In May 2017, J.T.S.H. underwent a psychological and intelligence evaluation performed

by Sandy Wong, M.S. Ed., a clinician with YAI Center for Specialty Therapy ("YAI"), to evaluate

his eligibility for services through the New York State Office for People with Developmental Disabilities ("OWPDD").  (A.R. 479, 485.)  The examiner found J.T.S.H.'s levels of adaptive functioning in all domains were low and beneath the 1st percentile.  (A.R. 481-82.)

In June 2017, J.T.S.H. underwent an Autism Evaluation by Rachel Gottlieb, M.S. Ed., a clinician with YAI.  (A.R. 473.)  Overall, the evaluations "indicate[d] impairment in communication and reciprocal social interaction and the presence of restrictive and repetitive behavior" and J.T.S.H. met the criteria for ASD with a score falling in the severe range.  (A.R. 453, 476.)

 b. *Evaluations*

  i. Dr. Porcelli

On June 14, 2017, Dr. Porcelli performed a child psychiatric evaluation of J.T.S.H. Plaintiff reported that J.T.S.H. had fair relationships with parents and other adults but could get easily annoyed and often argued or talked back, had good relationships with his siblings, and fair quality of relationships with children the same age but could sometimes lose his temper easily and become easily annoyed.  (A.R. 459-60.)  Plaintiff reported that J.T.S.H. would experience temper tantrums at times, fail to pay attention to detail, make careless mistakes, have difficulty sustaining attention in tasks or in play, failed to follow through on instructions or finish work, was disorganized, was easily distracted, had excessive motor behavior in inappropriate settings, had excessive talking, had difficulty waiting his turn, and had impulsivity.  (A.R. 460.)  A mental status exam showed that J.T.S.H. had normal posture, somewhat hyperactive motor behavior, appropriate eye contact, adequate expressive and

receptive language, full affect, intact and age appropriate attention, concentration, and memory, below average cognitive functioning, and fair insight and judgment.  (A.R. 461-62.)

Dr. Porcelli also performed intelligence testing of J.T.S.H.  (A.R. 454.)  Testing showed a full scale IQ of 85, with a score of 98 in the subset of verbal comprehension and a score of 75 in the subset of processing speech index, which was "significantly discrepant" and "most likely attributed to his diagnosis of ADHD."  (A.R. 456.)  Dr. Porcelli assessed Plaintiff with ADHD and learning disability and opined that the results of the examination appeared to be consistent with psychiatric and cognitive problems but that, in themselves, they did "not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis."  (A.R. 457.) Dr. Porcelli opined that Plaintiff could attend to, follow and understand age-appropriate direction without limitations; had no limitations with regard to learning in accordance to cognitive functioning or with asking questions, requesting assistance in an age-appropriate manner, being aware of danger and taking needed precautions; had mild limitations with regard to interacting adequately with peers and adults, adequately maintaining appropriate social behavior, and responding appropriately to changes in the environment; and had moderate limitations with regard to sustaining concentration and completing age-appropriate tasks.  (A.R. 457, 462.)

   ii. Dr. Puttanniah

In June 2017, Dr. Puttanniah, a non-examining and state agency physician, found that J.T.S.H. had only two impairments that satisfied the threshold severity test: his ADHD and an unspecified learning disorder.  (A.R. 60.)  Specifically, he found that one of the six domains affected was Attending and Completing Tasks where J.T.S.H. was limited only to a less-than-

marked degree. Although the impairments identified were severe, Dr. Puttanniah concluded

J.T.S.H. did not meet any listing criteria. (A.R. 60.) However, of note, the records reviewed by

Dr. Puttanniah were limited to before June 21, 2017 and only had J.T.S.H.'s treatment history

which included the report of Dr. Porcelli and J.T.S.H.'s initial intake and first appointment for

treatment at UMMHC and did not include the treatment records from YAI with Rachel Gottlieb

where J.T.S.H. was diagnosed with ASD.

       iii.    Dr. Susan Santarpia

In March 2019, Dr. Santarpia evaluated J.T.S.H. where Plaintiff reported that J.T.S.H.

received regular education and special education, had been diagnosed with ADHD and ASD,

and saw Dr. Hadley for medication management and "Maria" for counseling at YAI.[2] (A.R. 496.)

Plaintiff reported that he had good relationships with his grandmother, siblings, and peers but

bullied other children. (A.R. 496.) She also noted that J.T.S.H.'s hyperactive symptoms included

failure to pay attention to detail, disorganization, distractibility, impulsiveness, and fidgety

behavior. (A.R. 496.) Dr. Santarpia noted that J.T.S.H. presented as "quite interactive and

social," did not report any social skills deficit, made good eye contact, did not present with

restricted affect or limited social interests, did not appear inflexible, and did not present with

any sensory issues, echolalia, or repetitive behaviors. (A.R. 497.) A mental status exam showed

that J.T.S.H. was cooperative and had age-appropriate manner of relating, normal motor

behavior, age appropriate speech, full affect, intact attention and concentration, intact and

age-appropriate memory, and age-appropriate insight and judgment. (A.R. 497-98.)

---

[2] The record is devoid of any treatment records by Dr. Hadley and Maria. The record does not indicate that Plaintiff provided their treatment records, and the ALJ did not inquire about the records for those physicians generally during the administrative hearing.

Dr. Santarpia also performed intelligence testing of J.T.S.H.  (A.R. 501.)  Dr. Santarpia observed that J.T.S.H. had normal motor behavior, appropriately focused motor behavior, age appropriate speech and language skills, and cooperative and friendly attitude.  (A.R. 501.) During the evaluation, J.T.S.H. recalled and understood instructions; had deliberate, orderly, and self-correcting style of responding; had good attention and concentration; worked with reflection and deliberation; and did not evidence significant emotional distress.  (A.R. 502.)  The exam showed full scale IQ of 85 (low average range).  (A.R. 503.)  J.T.S.H.'s adaptive functioning was within normal limits for communication, self-care, social community, self-direction, health and safety, academics, home living, and leisure.  (A.R. 503.)  In both evaluations, Dr. Santarpia assessed Plaintiff with ADHD and opined that the results of the exam appeared to be consistent with psychiatric problems but that, in themselves, they did "not appear to be significant enough to interfere with [J.T.S.H.'s] ability to function on a daily basis."  (A.R. 499.)

  *c.  The ALJ Hearing*

  At the April 2019 hearing, Plaintiff not yet represented by counsel, testified that J.T.S.H. received mental health treatment through "YEI"[3] and was prescribed Focalin, which helped control his symptoms "[s]omewhat."  (A.R. 38-39.)  Plaintiff further testified that there were times when J.T.S.H. was "all over the place" with "constant talking" and needing "constant redirecting" to do activities like putting on clothes, tying his shoes, and being quiet.  (A.R. 46.)

  Plaintiff reported that J.T.S.H. had been doing well with tutoring but had failed three classes in the last marking period.  (A.R. 37-38.)  She reported that J.T.S.H. was able to dress,

---

[3] The transcript refers to "YEI" which given the context, the Court assumes to be the same as "YAI".

bathe, and groom himself but needed reminders, and he took a city bus to school.  (A.R. 39.)

He had some problems in school because he played too much, did not focus, and did not keep

himself organized, and had many in-school suspensions.  (A.R. 39-41.)  J.T.S.H. had some friends

in school but not outside of school, and spent his time at home watching television and playing

video games.  (A.R. 39, 41.)  The ALJ also questioned J.T.S.H. about sports and his favorite

subject.  (A.R. 45-47.)  J.T.S.H. testified that math was his favorite subject in school and that he

behaved for the most part if someone did not get on his "bad side."  (A.R. 45-46.)  J.T.S.H.

stated that his medications made him more focused but also made him tired.  (A.R. 47.)

Plaintiff stated the medications were somewhat effective.  (A.R. 39.)

### 3. Commissioner's Decision

Applying the framework for child claims, the ALJ found that Plaintiff had severe

impairments of ASD, ADHD, learning disorder, and asthma but that these impairments did not

meet or equal the severity of one of the listed impairments in the regulations.  (A.R. 12-13.)

The ALJ also found that J.T.S.H.'s limitations were not "functionally equivalent" to a listed

impairment because he had less than marked limitations in the six childhood functional

domains.  (A.R. 13-24.)  The ALJ concluded that Plaintiff had not shown that J.T.S.H.'s medical

impairments imposed extreme limitations in at least one of these domains, or marked

limitations in at least two domains, and therefore failed to show a continuous period of

disability that lasted at least twelve months and started during the relevant time period.  (A.R.

23.)

The ALJ determined that neither J.T.S.H.'s ASD nor his ADHD met the standards of the

relevant listings, Listings 112.10 and 112.11, respectively.  (A.R. 13.)  The ALJ notes, that "no

treating, examining, or non-examining medical source has mentioned findings or rendered an

opinion that the claimant's impairments, singly or in combination, medically equaled the

criteria of any listed impairment" and particular consideration was given to ASD and

neurodevelopmental disorders.  (A.R. 13.)  As for functional equivalence, the ALJ found that

J.T.S.H. had less than marked limitations in two domains: (1) acquiring and using Information;

and (2) attending and completing tasks.  (A.R. 18-23.)  The ALJ found that J.T.S.H. had no

limitations in the remaining three: (1) interacting and relating with others; (2) moving about

and manipulating objects, and (3) caring for yourself.  *Id.*

The ALJ found the June 2017 report of the state agency physician, Dr. Puttanniah,

"mostly persuasive," noting that he disagreed with Dr. Puttanniah in part, instead finding that

"claimant does have less than marked limitations in his ability to acquire and use information,

based on his IQ, as well as being in an integrated classroom setting, and having a learning

disorder."  The ALJ found the opinion of Dr. Porcelli persuasive, noting that she found J.T.S.H.

only moderately limited in sustaining concentration and completing age-appropriate tasks

which was consistent with treating records and reports of daily living functions.  (A.R. 16.)

Finally, the ALJ found the 2019 opinion of the second consultant, Dr. Santarpia, as only

"partially persuasive", noting that "although the opinion is supported . . . the records support

some limitations."  (A.R. 16-17.)  The ALJ disagreed with Dr. Santarpia's findings that J.T.S.H. did

not have ASD and had no functional limitations resulting from his ADHD.  *Id.*

**DISCUSSION**

1.  **Legal Standard**

Under Federal Rule of Civil Procedure 12(c), "a movant is entitled to judgment on the

pleadings only if the movant establishes 'that no material issue of fact remains to be resolved

and that [he] is entitled to judgment as a matter of law.'"  *Guzman v. Astrue*, 2011 WL 666194,

at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir.

1990)).  Any "final decision" of the Commissioner is subject to judicial review.  42 U.S.C. §

405(g).  A court's review of a Social Security disability determination requires two distinct

inquiries.  *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Dwyer v. Astrue*, 800 F. Supp.

2d 542, 546 (S.D.N.Y. 2011).  First, the court must determine whether the Commissioner

applied the correct legal principles in reaching a decision.  *See Estrella v. Berryhill*, 925 F.3d 90,

95 (2d Cir. 2019).  Second, the court must decide whether the Commissioner's decision is

supported by substantial evidence in the record.  *Id.*  If the Commissioner's decision is

supported by substantial evidence, the ALJ's findings as to any facts are conclusive.  42 U.S.C. §

405(g).

a.  *Development of the Record*

An ALJ has an affirmative duty to develop the record on behalf of claimants.  *See*

*DeGraff v. Comm'n of Social Security*, 850 F. App'x 130 (2d Cir. 2021); *Moran v. Astrue*, 569 F.3d

108, 112-13 (2d Cir. 2009); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  This duty exists

because social security proceedings are essentially non-adversarial.  20 C.F.R. § 404.900(b);

*Shafer v. Colvin*, 2018 WL 4233812, at *7 (S.D.N.Y. Feb. 15, 2018) (*report and recommendation*

*adopted*, 2018 WL 4232914 (S.D.N.Y. Sept. 4, 2018)).  A remand by the court for further

proceedings is appropriate when the Commissioner has failed to provide a full and fair hearing, to make explicit findings, failed to appropriately develop the record, or to have correctly applied the regulations. *Ming v. Astrue*, 2009 WL 2495947, at *3 (E.D.N.Y. Aug. 13, 2009); *Donnelly v. Colvin*, 2015 WL 1499227, at *8 (S.D.N.Y. Mar. 31, 2015).

The Second Circuit has outlined a heightened duty an ALJ bears in the case of *pro se* claimants to ensure that the claimant has had "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." *Gold v. Secretary of HEW*, 463 F.2d 38, 43 (2d Cir. 1972). Where, as here, the claimant was unrepresented by counsel at the administrative hearing, the ALJ is under a heightened duty "'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold*, 463 F.2d at 43). A reviewing court must determine whether the ALJ "adequately protect[ed] the rights of [a] *pro se* litigant by ensuring that all of the relevant facts were sufficiently developed and considered." *Id.* "Rather than gather every conceivable medical record during the relevant period, therefore, the ALJ must obtain additional information . . . when the evidence as a whole is not complete enough for the ALJ to make a determination." *Clarke v. Comm'r of Soc. Sec.*, 2021 WL 2481909, at *13 (S.D.N.Y. 2021) (internal quotation marks omitted). Nonetheless, the ALJ's duty to develop the record is "doubly heightened" where the claimant both is unrepresented and alleges mental illness. *See Maldonado v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 183, 193 (S.D.N.Y. 2021).

   *b. Standard for Assessing Eligibility for Benefits for Children*

To assess whether a child claimant qualifies for SSI, the ALJ must conduct a three-step sequential inquiry. *See Pollard v. Halter*, 377 F. 3d 183, 189 (2d Cir. 2004). If it is determined

that a claimant is not disabled at any step in the evaluation process, the ALJ does not continue

to the next step.  At step one, the ALJ must find that the claimant is not engaged in any

"substantial gainful activity."  20 C.F.R. § 416.924(a).  At step two, the ALJ must determine

whether the child has a medically determinable severe impairment, i.e., an impairment or

combination of impairments "that causes . . . more than minimum functional limitations."  *Id*. §

416.924(c).  Finally, at the third step, the ALJ must assess whether the child has an impairment

or combination of impairments that meets, medically equals, or functionally equals one of the

impairments in the "Listings."  *Id.* § 416.924(d). (The impairments listed in 20 CFR Appendix 1,

Subpart P, Part 404 are known as the "Listings").

If a child claimant's impairments do not meet or medially equal any of the Listings, the

ALJ must then determine whether they functionally equal a Listing.  *Pollard*, 377 F. 3d at 189.

To functionally equal a Listing, the ALJ must find that the severe impairment(s) at issue results

either in "marked" limitations in two of the six domains of functioning or an "extreme"

limitation in one of the six domains of functioning.  20 C.F.R. § 416.926a(a).  The six domains of

functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3)

interacting and relating with others; (4) moving about and manipulating objects; (5) caring for

oneself; and (6) health and physical well-being.  20 C.F.R. §§ 416.926a(b)(1)(i)-(vi).  Limitations

are "marked" when the impairment(s) "interferes seriously with your ability to independently

initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  A marked limitation "is

the equivalent of the functioning [the ALJ] would expect to find on standardized testing with

scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

Limitations are "extreme" when the impairment(s) "interferes very seriously with your ability to

independently initiate, sustain, or complete activities" and is "more than 'marked." 20 C.F.R. §

416.926(e)(3)(i).  "It is the equivalent of the functioning [the ALJ] would expect to find on

standardized testing with scores that are at least three standard deviations below the mean."

*Id.*

### 2.  Application

Here, the ALJ failed to develop the record in two areas.  First, the ALJ failed to obtain

J.T.S.H.'s latest treatment records.  Second, the ALJ failed to provide a full and fair hearing by

failing to sufficiently question Plaintiff and J.T.S.H.  Each are discussed in turn.

*Records*

Plaintiff asserts that the ALJ failed to request any of J.T.S.H.'s special education records

for the two years preceding the hearing (such as individual education plans and teacher

reports) and obtain records from mental health care providers, including YAI where J.T.S.H. was

prescribed his medication (Focalin) and received counseling.  Generally, the ALJ shall develop a

complete medical history of for at least the twelve months preceding an application for

benefits.  42 U.S.C. § 423(d)(5)(B).  Thus, a complete treatment record for J.T.S.H. would include

the twelve months before April 27, 2017, the filing date.  Here, in light of the significant time

between the filing of the claim and the administrative hearing – almost two years – the ALJ

should have sought the records of Dr. Hadley and Maria[4], J.T.S.H.'s treating physician and

counselor at YAI.[5]  When completing the recent medical treatment forms for the hearing,

Plaintiff indicated that Dr. Hadley was a treating doctor who had seen J.T.S.H. in 2018 and that

---

[4] Plaintiff's application to the Commissioner prior to the hearing indicates that J.T.S.H also saw "Jodi" at YAI.
[5] Plaintiff asserts that the ALJ did not obtain any records from YAI (Pl. Brief page 16, ECF No. 37), however, the administrative record includes autism assessments from June 2017 performed by YAI.

YAI counselor "Jodi" also prescribed medication.  (A.R. 160, 162.)  The last records from YAI were from July 2017.  The ALJ never sought updated records from J.T.S.H.'s treating providers. This was a failure of his obligations under applicable law.  *See* 20 C.F.R. §§ 404.1512(b)(1)(i) ("Every reasonable effort means that we will make an initial request for evidence from your medical source . . . [and] make one follow-up request to obtain the medical evidence necessary to make a determination.").  *Thomas v. Comm'r of Soc. Sec.*, 2022 WL 523544, at *6 (E.D.N.Y. Feb. 22, 2022) (citation omitted) ("Courts have found that a failure to obtain psychiatric and therapy treatment notes constitutes an obvious gap that requires further development of the record.").

Although the ALJ requested and Plaintiff underwent a consultative examination conducted by Dr. Santarpia in 2019, the ALJ's failure to obtain treatment records from treating physician Dr. Hadley fails to meet the heightened standard owed to a *pro se* Plaintiff alleging mental impairments.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, § 112.00.C.5.a. ("Longitudinal medical evidence can help us learn how you function over time, and help us evaluate any variations in your level of functioning.  We will request longitudinal evidence of your mental disorder when your medical providers have records concerning you and your mental disorder over a period of months or perhaps years[.])"  By any account, it is likely that Dr. Hadley would have had records relevant and/or necessary to the ALJ's determination on whether J.T.S.H was disabled.  *See Thomas*, 2022 WL 523544, at *5 (quoting *Estrella*, 925 F.3d at 98 ("Assembling a complete medical history before reaching an RFC is particularly important in the context of mental health, where a consultative examiner's one-time opinion 'may not be indicative of her longitudinal mental health.'").  Likewise, Defendant's assertion that there was

16

not a gap in the record is unavailing, given the length of the missing longitudinal medical history where J.T.S.H. is allegedly suffering from a mental impairment. *See Nefrititi S. o/b/o A.E.A. v. Comm'r of Soc. Sec.*, 2021 WL 2649649, at *4 (W.D.N.Y. June 28, 2021) (noting that "by neglecting to make every reasonable effort to complete the record, the ALJ failed to obtain years of both school records and counseling records" and finding defendant's argument "unavailing since there were records of treatment, central to plaintiff's disability determination, but they were not obtained.").

While the Court notes that Plaintiff declined to review the record to ensure it was complete (A.R. 35), the ALJ has an independent duty to develop the record and request applicable records. *Greene v. Comm'r of Soc. Sec*, 2019 WL 2422429, at *5 (W.D.N.Y. June 7, 2019) (internal citation omitted) ("Without dispute, the ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings regardless of whether claimant is represented by counsel."); *see also Rodriguez v. Barnhart*, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."); *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

Absent information about J.T.S.H.'s treatment from 2017 to the hearing date, the ALJ could not properly assess whether functioning had improved, worsened or stayed the same, despite the consultative exam performed which only captures a single snapshot of an alleged mental impairment. *Thomas*, 2022 WL 523544, at *8. The same is true for J.T.S.H.'s special education records for the two years preceding the hearing.

17

*Administrative Hearing*

In addition to not collecting all relevant treatment records, the ALJ failed to properly develop testimony from Plaintiff and J.T.S.H. at the hearing.  Plaintiff testified that, "[t]he autism, itself, is a lot, you know.  And the ADHD."  (A.R. 49.)  The ALJ responded, "Mm-hmm." *Id.*  Plaintiff went on to testify that "I don't reckon that he'll ever be able to be by himself. . . . Because of his Autism and . . . the ADHD."  *Id.*  To which the ALJ responded, "[o]kay, so what I'll do is I'll review what I have.  I'll [send] (sic) you my decision in the mail."  *Id.* at 50.  The ALJ did not inquire further as to J.T.S.H.'s subjective symptoms or what if any rationale would give Plaintiff pause as to why J.T.S.H. may never be able to be himself.  *See Mongeur*, 722 F.2d at 1037 (noting that the Commissioner is required to examine the claimant's subjective complaints).

The ALJ failed to ask sufficient follow up questions to ascertain J.T.S.H.'s functioning in the six functional domains.  For example, the ALJ found J.T.S.H. had a less than marked limitation in acquiring and using information, but failed to question J.T.S.H. and Plaintiff about the learning disabilities that may have caused J.T.S.H. to fail three classes that marking period. Further, the ALJ may have asked the impact the counseling J.T.S.H. was receiving in his ability to interact with others or the extent as to which Plaintiff had to remind and redirect J.T.S.H. to put on his clothes and exude proper hygiene.  These functional areas were identified by Plaintiff as ones where J.T.S.H. had some deficiencies, but the ALJ seemingly glossed over them.

Additionally, the ALJ did not ask which psychiatric professional J.T.S.H. was seeing, the frequency of such treatments, the length of his treatment at YAI, the intensity of J.T.S.H.'s mental impairments or whether any treatment was recommended outside of his prescribed

18

Focalin medication, which according to Plaintiff did not always work.  The ALJ also failed to ask

Plaintiff and/or J.T.S.H. about his current ADHD symptoms, the behaviors which led to J.T.S.H.'s

ASD diagnosis, and the impact of the alleged mental impairments on his daily life.  Questioning

in this area surely would have assisted the ALJ in assessing the functional domains of acquiring

and using information, attending and completing tasks, and interacting and relating with

others.  *See* 20 C.F.R. §§ 416.926a(b)(1)(i)-(iii).

The ALJ has a duty to develop the record by asking "meaningful, probing questions

about the medical issues" in which the claimants complain.  *Rodriguez v. Comm'r of Soc. Sec.*,

2021 WL 4200872, at *21 (S.D.N.Y. Aug. 19, 2021).  The duty to develop the record goes beyond

getting medical records, it also includes "the duty to question the claimant adequately about

any subjective complaints and the impact of the claimant's impairments on the claimant's

functional capacity."  *Pena v. Astrue*, 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008).

As discussed above, J.T.S.H. was seeing Dr. Hadley and Maria for treatment at the YAI.

(A.R. 160.)  However, the record does not include any details about the frequency and length of

their treatment of J.T.S.H.  According to Plaintiff, J.T.S.H. was seen at YAI from mid-2017

through the date of the hearing.  (Pl. Brief page 14.)  Dr. Santarpia's evaluation report also

indicates that J.T.S.H. was seeing "Maria for counseling" at the YAI.  Yet, the ALJ did not ask

about this counselor or seek information as to the treatment and its effectiveness.

Additionally, Clinician Gottlieb also recommended services after finding J.T.S.H. suffered from

severe ASD including psychotherapy, behavior therapy, and after-school programs, but the

record does not indicate whether J.T.S.H. received such services and the ALJ also did not

inquire.  The failure to ascertain more information about J.T.S.H.'s treating physicians and

19

counselors at the administrative hearing constitutes a failure to develop the record. *See Collins*

*o/b/o J.T.C. v. Comm'r of Soc. Sec.*, 2020 WL 1302311, at *2 (W.D.N.Y. Mar. 19, 2020)

(remanding for failure to elicit testimony regarding counselor at the administrative hearing and

obtaining school records); *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016)

("The absence of any treatment records from [the claimant's treating psychiatrist], with no

documented attempts by the ALJ to obtain them, is such a clear violation of the ALJ's duty to

develop the record that it is not unheard of in such cases for the Commissioner to affirmatively

move to remand the case on that basis.").

The failure to develop the record is not harmless, as it precludes the ALJ from evaluating

the "whole child" as contemplated by SSR 09-p.  This approach first considers the child's

functioning without considering the domains or individual impairments and then evaluates how

a child's functioning is affected during all activities, at home, school and in the community.  *Id.*

If the child's activities are limited in some way, the ALJ then determines which domains are

involved to determine functional limitations.  *Id.*  "This technique for determining functional

equivalence accounts for all of the effects of a child's impairments singly and in combination—

the interactive and cumulative effects of the impairments—because it starts with a

consideration of actual functioning in all settings."  SSR 09-1p; *see also Morris on behalf of V.V.*

*v. Comm'r of Soc. Sec.*, 2022 WL 298673, at *11 (S.D.N.Y. Feb. 1, 2022).  Importantly, the

regulations also recognize that a child may perform better in a structured or supportive setting

and worsen in other settings.  20 C.F.R. § 416.924a(b)(5).  For this reason, the Commissioner

recognizes that accepting the observation of the child's behavior or performance in an unusual

setting, like a consultative examination, without considering the rest of the evidence could lead to an erroneous conclusion about the child's overall functioning.  20 C.F.R. § 416.924a(b)(6).

The ALJ's reliance on the consulting examiner without obtaining complete information from Plaintiff during the hearing about the child's functioning in the home and community settings (or updated school records to assess the child's functioning in the school setting) was erroneous.  Both Plaintiff and Clinician Gottlieb indicated that J.T.S.H.'s ASD was severe. Gottlieb noted J.T.S.H. displayed impairments in both communication and reciprocal social interaction, and restrictive and repetitive behaviors.  These impairments are relevant to the functional areas of attending and completing tasks, interacting and relating with others, and caring for oneself, which the ALJ failed to sufficiently probe during the hearing.  Thus, without an adequate record, neither the ALJ nor this Court can competently determine the child's functional limitations and their severity.  *Rodriguez*, 2021 WL 4200872, at *21 (recommending remand partly because ALJ did not ask meaningful or probing questions); *Maldonado*, 524 F. Supp. 3d at 195 ("The dearth of questioning on Maldonado's mental limitations and the fact that Maldonado was *pro se* persuades us that we are compelled to remand to require further questioning); *Mann v. Chater*, 1997 WL 363592, at *8 (S.D.N.Y. June 30, 1997) (finding "that the ALJ failed to give the *pro se* plaintiff a full and fair hearing by affirmatively assisting plaintiff in developing, for the record, her subjective claims of pain and disability"); *Smith v. Berryhill*, 2019 WL 3936736, at *11 (E.D.N.Y. Aug. 20, 2019) ("Given the failure to sufficiently question plaintiff about her subjective complaints, remand is appropriate";) *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 352 (E.D.N.Y. 2010) (finding remand appropriate when ALJ did not question plaintiff further at the hearing to resolve uncertainties on his subjective symptoms and how

they affected plaintiff's daily functioning); *Afriyie o/b/o D.K.B. v. Saul*, 2020 WL 5416570, at *17 (S.D.N.Y. Sept. 10, 2020) ("lack of questioning represents a host of lost opportunities where the ALJ should have questioned [claimant] more fully concerning various aspects of her testimony.") (internal alterations and citation omitted); *Rodriguez v. Comm'r of Soc. Sec.*, 2021 WL 5154112, at *5 (S.D.N.Y. Nov. 5, 2021).

Finally, because the Court finds that a remand is required to further develop the record, it does not reach Plaintiff's argument that the ALJ cherry-picked findings to support his determination.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED and Defendant's cross-motion is DENIED. The case is remanded to the Commissioner for further proceedings consistent with this opinion. Because the case must be remanded for additional questioning and obtaining treatment records, the ALJ is directed to also obtain updated school records (e.g., individual education plan). *Daisy P. o/b/o C.P. v. Saul*, 2021 WL 911709, at *4 (W.D.N.Y. Mar. 10, 2021) (when a child alleges a mental impairment, "the failure to obtain school records can support a remand for failure to develop the record.").

**SO ORDERED.**

Dated:      March 9, 2022
            New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge

22